## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| U.S. PHILIPS CORPORATION, | ) | |
| Plaintiff, | ) ) ) | Case No. 06-0251 GMS |
| v. | ) ) | |
| EASTMAN KODAK COMPANY, | ) ) | |
| Defendant. | ) ) ) ) | |

## DECLARATION OF T. JESSE HINDMAN IN SUPPORT OF EASTMAN KODAK COMPANY'S ANSWERING CLAIM CONSTRUCTION BRIEF

I, T. Jesse Hindman, declare as follows:

1.     I am an associate with the law firm DLA Piper US LLP, attorneys of record for defendant Eastman Kodak Company ("Kodak") in the above matter. Unless the context indicates otherwise, I make this declaration based upon my own personal knowledge.

2.     Attached hereto as Exhibit F is a true and correct copy of United States District Court for the Northern District of California, San Jose Division "Order Construing Claims of United States Patent No. 4,698,672."

3.     Attached hereto as Exhibit G is a true and correct copy of IEEE Standard Dictionary of Elec. and Elec. Terms, 3d ed. (1984) at 1001.

4.     Attached hereto as Exhibit H is a true and correct copy of IEEE Standard Dictionary of Elec. and Elec. Terms, 4th ed. (1986) at 1076.

I declare under penalty of perjury that the forgoing is true and correct to the best of my knowledge.

Dated this 30th day of October, 2007, in San Diego, California.

T. Jesse Hindman

## CERTIFICATE OF SERVICE

I, Kristen H. Cramer, hereby certify that on October 30, 2007, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to registered counsel of record via e-mail.

I further certify that on October 30, 2007, I caused a copy of the foregoing document to be served on the following counsel of record by the manner so indicated:

**BY E-MAIL AND HAND DELIVERY**
Steven J. Balick
John G. Day
Tiffany Geyer Lydon
Ashby & Geddes
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899

**BY E-MAIL AND U.S. MAIL**
Thomas W. Winland
Steven M. Anzalone
Frank A. DeCosta, III
Joyce Craig
Finnegan Henderson Farabow Garrett and Dunner LLP
901 New York Avenue, NW
Washington, DC 20001

/s/ Kristen Healey Cramer

Kristen Healey Cramer (#4512)

# EXHIBIT F

1

2                                                        **E-Filed 6/28/06**

3

4

5

6

7

8                                        NOT FOR CITATION

9                          **IN THE UNITED STATES DISTRICT COURT**

10                       **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

11                                     **SAN JOSE DIVISION**

12

13   IN RE COMPRESSION LABS, INC., PATENT          Case Numbers  M: C 05-01654 JF (RS)
     LITIGATION                                                  C 05-01567 JF (RS)

14

15   MICROSOFT CORPORATION,

16                          Plaintiff,            ORDER[1] CONSTRUING CLAIMS OF
                                                 UNITED STATES PATENT NO.
17        v.                                     4,698,672

18   COMPRESSION LABS, INC., et al.,

19                          Defendants.

20

21

22        On March 9, 2006, the Court held a hearing for the purpose of construing key disputed

23   terms in the claims of United States Patent No. 4,698,672 ("the '672 patent").  After

24   consideration of the arguments and evidence presented by the parties and the relevant portions of

25   the record, the Court construes the disputed terms as set forth below.

26

27   _____

28        [1] This disposition is not designated for publication and may not be cited.

# I. BACKGROUND

On February 16, 2005, the Judicial Panel on Multidistrict Litigation ("Panel") issued a Transfer Order pursuant to 28 U.S.C. § 1407, transferring and consolidating eight actions, then pending in the Eastern District of Texas, the District of Delaware, and this district. These actions are: *Compression Labs, Inc. v. Adobe Systems Inc., et al.*, C.A. No. 2:04-158 (E.D. Tex.), *Compression Labs, Inc. v. Dell, Inc., et al.*, C.A. No. 2:04-159 (E.D. Tex.), *Compression Labs, Inc. v. Acer America Corp. et al.*, C.A. No. 2:04-294 (E.D. Tex.), *Agfa Corp., et al. v. Compression Labs, Inc., et al.*, C.A. No. 1:04-818 (D. Del.), *Yahoo! Inc. v. Compression Labs, Inc., et al.*, C.A. No. 1:04-918 (D. Del.), *Audiovox Corp., et al. v. Compression Labs, Inc., et al.*, C.A. No. 1:04-1293 (D. Del.), *Sun Microsystems, Inc. v. Compression Labs, Inc.*, C.A. No. 3:04-3124 (N.D. Cal.), and *Google, Inc. v. Compression Labs, Inc., et al.*, C.A. 4:04-3934 (N.D. Cal.). The Panel noted that all of the actions involve the '672 patent, owned by Plaintiff Compression Labs, Inc. ("CLI"), acquired by Forgent Networks in 1997. In each action, the parties dispute whether the '672 patent is valid and whether it is infringed by products that use the Joint Photographic Experts Group ("JPEG") international standard for the compression of digital still images. On April 4, 2005, *Compression Labs Inc. v. Creo Inc. et al.*, C.A. 2:04-410 (E.D. Tex), was transferred to this district pursuant to a Conditional Transfer Order. In a related action filed on April 15, 2005, *Microsoft Corp. v. Compression Labs, Inc., et al.*, C 05-1567 JF, Microsoft requests declaratory, injunctive, and other relief with respect to the alleged invalidity of and Microsoft's alleged non-infringement of the '672 patent. Because of the pending multidistrict litigation, the *Microsoft Corp.* action was stayed on July 5, 2005. On December 22, 2005, Plaintiff filed a Second Amended Complaint, alleging infringement of the '672 patent.

Plaintiff, together with Defendants and Declaratory Judgment Plaintiffs Acer America Corp., Agfa Corp., Apple Computer, Inc., BancTec, Inc., Canon U.S.A., Inc., Concord Camera Corp., Creative Labs, Inc. and Creative Technology, Inc., Creo, Inc. and Creo Americas, Inc., Dell, Inc., Eastman Kodak Company, Fujitsu Computer, Gateway, Inc., Hewlett-Packard Company, International Business Machines Corporation, JVC Americas Corporation, Kyocera Wireless, Mitsubishi Digital Electronics America, Inc., Microsoft Corporation, Palm, Inc.,

2

1   Panasonic Corporation of North America (formerly known as Matsushita Electric Corporation of

2   America), Ricoh Corporation, Sun Microsystems, Inc., Thomson, S.A., and TiVo, Inc.

3   (collectively, "Defendants"),[2] requests a construction of eleven terms, located in claims 1, 2, 3, 4,

4   6, 7, 8, 10, and 38 of the '672 patent, and a determination as to whether the preambles of claims

5   1, 6, 10, and 38 recite claim limitations.

6        The '672 patent, issued to Plaintiff on October 6, 1987, covers methods and apparatus for

7   the compression of digital data.  The system described by the patent uses ordered redundancy

8   coding to reduce the amount of data so that it may be transmitted more easily.  Taking advantage

9   of the fact that certain values (often "0" and "1") occur more frequently, it represents data using

10  two types of runlength codes—a first type that represents runlengths of the most common value

11  (frequently "0") followed by the second-most common value (frequently "1"), and a second type

12  that represents runlengths of the most common value (frequently "0") followed by other values.

13  The parties dispute the construction of numerous terms in the '672 patent.  Significantly,

14  Defendants contend that the '672 patent covers only video data compression, while Plaintiff

15  argues that it also covers still image data compression (used by JPEGs).

16

17                              **II. DISCUSSION**

18  **1.    Claim term construction**

19       Claim construction is a question of law to be decided by the Court.  *Markman v.*

20  *Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996).  "It is

21  'bedrock principle' of patent law that 'the claims of a patent define the invention to which the

22  patentee is entitled the right to exclude.'"  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir.

23  2005).  When assessing claim meaning the Court must ask what a person having ordinary skill in

24

25       [2] Numerous Defendants and Declaratory Judgment Plaintiffs have been dismissed
    voluntarily or voluntarily dismissed their claims against Plaintiff, including Audiovox
26  Electronics Corporation, Axis Communications Incorporated, BenQ America Corp., Color
    Dreams, Incorporated, Google, Inc., JASC Software, Inc., Nuance Communications Inc. f/k/a
27  ScanSoft, Inc., Oce North America, Inc., Onkyo U.S.A. Corporation, Riverdeep, Inc., Xerox
    Corporation, and Yahoo! Inc.
28

Case No. M: C 05-01654 JF (RS) and C 05-01567 JF (RS)
ORDER CONSTRUING CLAIMS OF UNITED STATES PATENT NO. 4,698,672
(JFLC1)

1    the art would understand the claim language to mean at the time of the invention. *DeMarini*

2    *Sports, Inc. v. Worth, Inc.*, 239 F.3d 1314, 1324 (Fed. Cir. 2001). The general rule is "that terms

3    in the claim are to be given their ordinary and accustomed meaning." *Johnson Worldwide*

4    *Assocs. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999). The Federal Circuit has held that

5    "the ordinary and customary meaning of a claim term is the meaning that the term would have to

6    a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective

7    filing date of the patent application." *Phillips*, 415 F.3d at 1313. However, the patentee may

8    choose to be its own lexicographer and may use terms in a manner other than their ordinary

9    meaning so long as the special definition is stated clearly in the patent specification or file

10   history. *Vitronics*, 90 F.3d at 1582. The specification acts as a dictionary when it expressly

11   defines terms used in the claims or when it defines terms by implication, and is considered to be

12   "the single best guide to the meaning of a disputed term." *Id.*

13        The Court must look first to the intrinsic evidence of record: the patent claims, the

14   specification, and, if in evidence, the prosecution history. *Vitronics Corp. v. Conceptronic, Inc.*,

15   90 F.3d 1576, 1582 (Fed. Cir. 1996). The Court begins its "decisionmaking process by

16   reviewing the same resources as would [a person in that field of technology], *viz.*, the patent

17   specification and the prosecution history." *Phillips*, 415 F.3d at 1313 (quoting *Multiform*

18   *Desiccants, Inc. V. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998)). The specification,

19   which is usually dispositive, "'is the single best guide to the meaning of a disputed term.'" *Id.* at

20   1315 (quoting *Vitronics*, 90 F.3d at 1582).

21        In most situations, analysis of the intrinsic evidence will resolve any ambiguity regarding

22   a disputed claim term. *Vitronics Corp.*, 90 F.3d at 1583. In such circumstances, the Court may

23   not rely on extrinsic evidence. *Id.* However, where the intrinsic evidence is ambiguous as to a

24   disputed term or the scope of the invention, the Court may turn to extrinsic evidence such as

25   expert testimony, prior art, and inventor testimony. *Id.* at 1584. Such evidence may be used to

26   help the Court understand the claims but may not be used to vary or contradict the claim

27   language. *Id.* Dictionaries and comparable sources may be used in claim interpretation, "so long

28   as the dictionary definition does not contradict any definition found in or ascertained by a reading

4

of the patent documents." *Phillips*., 415 F.3d at 1322-23.  Expert testimony may be useful, for example, "to provide background on the technology at issue, to explain how an invention works, to ensure that the Court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Id*. at 1318.

As a general claim construction principle, the Court must "avoid the danger of reading limitations from the specification into the claim." *Phillips*, 415 F.3d at 1323.  While "the specification often describes very specific embodiments of the invention," the Federal Circuit has "repeatedly warned against confining the claims to those embodiments." *Id*.  The Federal Circuit has "expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment." *Id*. (citing *Gemstar-TV Guide Int'l, Inc. v. Int'l Trade Comm'n*, 383 F.3d 1352, 1366 (Fed. Cir. 2004)); *see also Rexnord Corp. v. Laitram Corp*., 274 F.3d 1336, 1344 (Fed. Cir. 2001) ("Our case law is clear that an applicant is not required to describe in the specification every conceivable and possible future embodiment of his invention.").  However, in some instances limitations from the specification may be imported into a claim.  In such instances, the Court "looks to whether the specification refers to a limitation only as part of less than all possible embodiments or whether the specification read as a whole suggests that the very character of the invention requires the limitation be a part of every embodiment." *Alloc Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1370 (Fed. Cir. 2003).  Where "the specification makes clear at various points that the claimed invention is narrower than the claim language might imply, it is entirely permissible and proper to limit the claim." *Id*.

### a. Claim term one

**"digital signals"** (claims 1 and 38) & **"processed signals"** (claim 6)

The parties' dispute with respect to term one is a dispute as to whether the '672 patent applies only to video signals or also to other types of signals (including, significantly, still images).  Plaintiff argues that term one should be construed as: "*A sequence of data to be*

5

1   *runlength encoded, having multiple values and a predetermined length*." Defendants argue that

2   this term should be construed as: "*A digital signal or processed signal is a set of data*

3   *representing frames of a video*."

4        As Defendants argue, in the context of the "typical[]" utilization of the ordered

5   redundancy coding system, the specification of the '672 patent clarifies that "processed signals"

6   include only video signals: "The processed signals are in the form of a *plurality* of multivalued

7   digital numbers, X(k), typically one number X(k), for each frame." '672 Patent col.3 ll.49-56

8   (emphasis added). Plaintiff argues that the foregoing definition must include a typographical

9   error because there are necessarily many numbers in a block and many blocks in a frame. Tr.

10   117:3-10. However, because the specification makes clear that "X(k)" represents a series of

11   values,[3] the foregoing description of "processed signals" is consistent with Plaintiff's view that

12   there are many numbers in a block. Accordingly, as explained in the specification, "processed

13   signals" typically are comprised of *plural* frames, thus indicating that processed signals are video

14   signals.

15        Plaintiff contends that its construction of "processed signals" and "digital signals" is

16   supported by the doctrine of claim differentiation. This doctrine "refers to the presumption that

17   an independent claim should not be construed as requiring a limitation added by a dependent

18   claim." *Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1380 (Fed. Cir. 2006);

19   *see also Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir., 2004) ("the

20   presence of a dependent claim that adds a particular limitation raises a presumption that the

21   limitation in question is not found in the independent claim."). While claim 19 is limited to

22   "input signals represent[ing] images . . . presented in sequential frames," claim 6, which

23   addresses "processed signals" and upon which claim nineteen is dependent, does not include

24   such a restriction. '672 Patent col.24 ll.13-16; col.25 ll.52-65. Plaintiff argues that this

25   necessarily means that claim six does not include a requirement that the signals be video signals.

26

27

28        [3] "In general, a K-valued digital number, X(k), is formed by a series of K values, x(k), as
follows: $X(k) = x(1), x(2), x(3), \ldots x(k), \ldots, x(K)$   where $1 \le k \le K$." '672 Patent col.12 ll.38-43.

6

However, "that the claims are presumed to differ in scope does not mean that every limitation

must be distinguished from its counterpart in another claim, but only that at least one limitation

must differ." *Kraft Foods, Inc. v. Int'l Trading Co.*, 203 F.3d 1362, 1368 (Fed. Cir. 2000). As

Defendants point out, because claim 19 adds limitations that are not in claim 6—the steps of

forming the mean-square difference and error and selecting a mode—the doctrine of claim

differentiation does not compel the Court to read out the restriction that the processed signals in

claim 6 are video signals.

Although the specification does not provide a similar explanation of "digital signals," the

parties initially agreed "that the Court should construe the terms 'processed signals' and 'digital

signals' identically for the purposes of the claims at issue."[4] Defendants and Declaratory

Judgment Plaintiffs' Responsive Markman Brief, p. 7 n.3. Because "processed signals" are a

subset of "digital signals," the Court was hesitant to apply the above explanation of "processed

signals" also to "digital signals." Accordingly, the Court requested and received supplemental

briefing addressing the question of whether "digital signals" and "processed signals" should be

given the same construction and, if so, why.

Plaintiff argues in its supplemental brief that, if the Court gives the above construction to

"processed signals,"[5] "digital signals" should not be similarly limited. Plaintiff emphasizes that

"processed signals" are a subset of "digital signals," pointing out that "digital signals" are

---

[4] Plaintiff's expert, Dr. Sheila Hemami, indicated that both "digital signals" and "processed signals" have a special meaning: "The terms 'digital signals' and 'processed signals' normally have a very broad meaning, but those terms are given a special and more particular meaning in the specification of the '672 Patent and as they are used [in] the claims." Declaration of Tibor L. Nagy ("Nagy Decl."), Ex. 2, p. 18. During oral argument, Plaintiff's counsel indicated that this was an "error" and that Dr. Hemami and Plaintiff's counsel "both regret having opened this can of worms [that Plaintiff conceded that the term 'processed signals' is not being used in the patent in accordance with how those ordinarily skilled in the art would commonly understand it] by suggesting that there is some special meaning to 'digital processed signals.'" Tr. 109:4-20. While the Court finds it somewhat instructive that Dr. Hemami wrote that "digital signals" and "processed signals" have a special and particular meaning in the '672 patent, the Court's construction of these terms does not turn on her statement.

[5] Plaintiff disputes that "processed signals" should be limited to video signals in its supplemental brief. Plaintiff's Second Supplemental Brief, p. 1.

7

equivalent to "input signals"[6] and "input signals" are *processed* to form "processed signals."[7] Plaintiff argues also that the "processing" referred to in claims 1 and 38 is different than the "processing" in claim 6. However, assuming arguendo that "digital signals" are *not* video signals, Plaintiff does not provide any explanation for how the processing of "digital signals" to create "processed signals" converts non-video signals into video signals. As Defendants argue, if "processed signals" are video signals, and processing does not convert non-video signals into video signals, the input signals or "digital signals" must also be video signals. In light of Plaintiff's initial concession that the terms should be construed identically, and in the absence of a persuasive argument as to how processing "digital signals" would convert non-video signals into video signals, the Court concludes that, if "processed signals" are video signals, "digital signals" must be given the same restriction.

Considering that the above explanation of "processed signals" is given in the context of a "typical[]" system, it does not on its own persuade the Court that "processed signals" and "digital signals" must be construed as video signals. However, this clear explanation of "processed signals," combined with numerous other indications that the patent applies exclusively to video signals, most logically supports such a construction. As noted above, where "the specification makes clear at various points that the claimed invention is narrower than the claim language might imply, it is entirely permissible and proper to limit the claim." *Alloc*, 342 F.3d at 1370.

The abstract of the '672 patent indicates that the patent is limited to video data: "The present invention specifically relates to methods and apparatus useful in video compression systems." '672 Patent, abstract; *Hill-Rom Co., Inc. v. Kinetic Concepts, Inc.*, 209 F.3d 1337,

---

[6] "Digital signals to be processed are input on lines 5 to the transmitter 2. The input signals on lines 5 are processed in one of a number of different modes so as to efficiently compress the data input signals to form processed signals for transmission to a receiver." '672 Patent col.4 ll.33-37.

[7] Claim 6 describes "[a] method for processing input signals to reduce the amount of data utilized to represent the input signals, the steps comprising, processing the input signals to form processed signals where the processed signals are digital numbers having first values, second values, and other values." '672 Patent col.24 ll.10-16; *see also id.*

8

1341 (Fed. Cir. 2000) ("We have frequently looked to the abstract to determine the scope of the

invention, [citations], and we are aware of no legal principle that would require us to disregard

that potentially helpful source of intrinsic evidence as to the meaning of claims."). The location

of a statement within the specification "can signal the likelihood that the statement will support a

limiting definition of a claim term." *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 864

(Fed. Cir. 2004). Specifically, "[s]tatements that describe the invention as a whole [which are

more likely to be found in certain sections of the specification], rather than statements that

describe only preferred embodiments, are more likely to support a limiting definition of a claim

term." *Id*. Although "certain sections of the specification are more likely to contain statements

that support a limiting definition of a claim term than other sections," the Court must determine

the significance of language in the specification "on a case-by-case basis." *Id*. Because the

abstract of the '672 patent states that it is "*useful in* video compression systems," this language in

itself does not necessarily limit the patent to video data. However, the language is another

significant factor supporting the Court's conclusion that the patent applies specifically to video

signals.

Another such factor is the explanation in the specification that the '672 patent was

designed to solve a problem specific to video data. "In construing claims, the problem the

inventor was attempting to solve, as discerned from the specification and the prosecution history,

is a relevant consideration." *CVI/Beta Ventures, Inc. v. Tura LP*, 112 F.3d 1146, 1160 (Fed. Cir.

1997). The patent specification describes the need that the '672 patent was designed to meet:

> If the communications link is an earth satellite, an unprocessed video signal
> typically occupies nearly the entire bandwidth of the satellite, with very few
> channels, if any, left over for other uses. A T1 communication channel is typical
> and has only a 1.5 megabit per second bandwidth. *A practical yet effective way to
> reduce the bandwidth of digitalized television signals is needed* so that fewer
> channels are required for transmission over a communications path and so that the
> quality of transmitted signals is maintained even when reduced bandwidth
> transmission is employed.

'672 Patent col.1 ll.34-44 (emphasis added).

Plaintiff argues that video data is referred to in the specification as an *example* of how the

9

1    ordered redundancy coding system may be applied.[8]  However, Plaintiff does not identify any

2    examples in the patent that do *not* involve video data.  Plaintiff's argument that the specified

3    application of the patent to the "intraframe mode" demonstrates that the patent was intended to

4    be applied to still images is not persuasive.  The specification explains that "[t]he decision as to

5    which mode to select is made based upon an analysis of the frame-to-frame differences (motion)

6    between the current input signals and the previous input signals."  '672 Patent, col.3 ll.61-64.

7    While the specification describes a "single image frame" in intraframe coding, it does so in the

8    broader context of describing video:

9           The U.S. Pat. No. 4,302,775 patents reduces redundancy by employing
10   intraframe coding techniques utilizing intraframe comparisons of cosine transform
     coefficients.  While the patent provides significant improvement over other
     techniques, there is a need for even greater compression.
11          In addition to intraframe coding techniques, interframe coding techniques
12   have been used to reduce the rate required for video transmission as described, for
     example, in the above-identified application.  Typically, each video frame is held
13   in memory at both the transmitter and the receiver and only frame-to-frame
     changes are transmitted over the communication link.  In contrast to intraframe
14   coding schemes in which the quality of coded images is dependent upon the
     amount of detail in each *single image frame*, the quality of the coded image in
15   interframe coding is dependent upon the differences from frame to frame.  Frame-
     to-frame differences are often referred to as "motion."

16   '672 Patent, col.2 ll.12-31 (emphasis added).  Nor is Plaintiff's argument that Defendants'

17   proposed construction excludes intraframe coding persuasive, as intraframe coding is a type of

18   video coding.

19          Considered together, the explanation that "processed signals" typically are comprised of

20   plural frames, the language of the abstract, the purpose of the invention, and the absence of any

21   example expressly identified as applying to still images all point to the conclusion that the '672

22   patent applies exclusively to video data.  Defendants note that Plaintiff's conduct over the past

23

24

25

26        [8]  *See, e.g.*, "The present invention specifically relates to methods and apparatus useful in
     video compression systems," '672 Patent, col.1 ll.19-20; "The ordered redundancy coding of the
27   present invention is typically utilized in a system that processes input signals, such as spatial
     domain image signals occurring in successive frames, to form processed signals for each frame,"
28   *id*. col. 3 ll.49-53.

                                                    10

two decades[9] is persuasive extrinsic evidence that the '672 patent applies exclusively to video data. This line of argument is unnecessary to support the Court's conclusion that "digital signals" and "processed signals" are video signals and is in the outer bounds of the type of extrinsic evidence that a Court should consider in construing patent claims. Accordingly, while evidence that Plaintiff may have delayed asserting that the use of JPEGs infringes the '672 patent would be highly relevant to a defense of laches at a later stage of litigation, the Court need not and does not rely on this argument in construing term one.

For the reasons stated above, the Court adopts Defendants' proposed construction of term one.

### b. Claim term two

**"[to form statistically coded signals such that] the more frequently occurring values of digital signals are represented by shorter code lengths and the less frequently occurring values of digital signals are represented by longer code lengths"** (claims 1 and 38)

**"[to form statistically coded signals such that] the more frequently occurring values in the digital numbers are represented by shorter code lengths and the less frequently occurring values of coded signals are represented by longer code lengths"** (claim 6)

The constructions proposed by Plaintiff and Defendants reflect disagreement over two issues. First, the parties dispute whether "values" should be construed to encompass "groups/sets/sequences of values" or instead to include only "each value in the 'digital numbers' or 'digital signals'" or an "individual value." Second, the parties dispute whether the term "how often," which would require that the statistical coding be based on the *actual* number of times a value occurs in a digital signal, should be included in the construction of term two. Plaintiff proposes the following construction for term two:

---

[9] For example, Defendants argue that even though Plaintiff was aware of the work being done by JPEG standard-setting committee and itself voted to approve the JPEG standard, it neither disclosed the '672 patent to the committee nor sought to license it. *See* Scarsi Decl., Ex. 2, pp. 202-204; Ex. 3, pp.153-56; Ex. 15. In contrast, Plaintiff was involved in the MPEG committee and disclosed the '672 patent to that committee. *See, e.g.*, Scarsi Decl., Exs. 12 and 13.

1    To form coded signals based on the statistical frequency of occurrence such that
2    more frequently occurring values or groups/sets/sequences of values are
     represented by shorter code lengths and less frequently occurring values or
3    groups/sets/sequences of values are represented by longer code lengths. See also
     the definitions of digital signals and digital numbers set forth above.

4    Defendants propose that term two should be construed as:

5    To form statistically coded signals such that] the length of the code representing
     each value in the 'digital numbers' or 'digital signals' depends on how often that
6    individual value appears in the 'digital numbers' or 'digital signal.'

7    During oral argument, the parties initially conceded to using the plain language of the

8    term without further construction. Tr. 201:9 - 202:24. However, Defendants later withdrew their

9    concession as to the second issue, that is, whether the statistical coding must be applied to the

10   actual values being coded.[10] With respect to the first issue, the Court will not give additional

11   construction to the term "values."

12        Defendants argue that the language of the specification and claims requires that the

13   statistical coding of signals be done with actual data rather than with representative or model

14   data. Defendants argue that the following language in claim 6 requires statistical coding of actual

15   data: "processing the input signals to form processed signals *where the processed signals are*

16   *digital numbers* having first values, second values, and other values" and "that the *more*

17   *frequently occurring values in the digital numbers* are represented by shorter code lengths." '672

18   Patent, col.24, ll.13-24 (emphasis added). However, this language does not establish clearly that

19   the actual data must be coded. While it is *possible* to infer that the clause "that the more

20   frequently occurring values *in the* digital numbers" indicates that the values *in the* particular

21   digital data must be coded, this is not the only conclusion that may be drawn from this language.

22   It is also possible to conclude that this term simply specifies what type of code length is assigned

23   to the more frequently occurring values, without inferring how the frequency of the values is

24   _____

25        [10] Counsel for Defendants stated: "We said we thought we would be okay with this
     construction, but we were concerned that there might be more guidance actually needed. And, in
26   fact, what's been pointed out to me is that it appears that there still, in fact, is an issue hanging
     out there. And I don't know if the proposed construction resolves that. And here's the issue:
27   The issue is whether the statistical coding is applied to the values in the signals that are actually
     being coded, if you will, or processed." Tr. 208:15 - 209:2.
28

                                                  12

1    determined.

2       Neither Plaintiff's nor Defendants' arguments based on the opinions of their experts are

3    persuasive.  Plaintiff's expert, Dr. Sheila Hemami, explained that "the required frequency of

4    occurrence information can be computed from a statistical model, from a set of training data, or

5    from a particular signal—there is no requirement that it represent only how often a particular

6    value appears in a signal or group of signals."  Declaration of Tibor L. Nagy ("Nagy Decl."), Ex.

7    2, p. 20.  Dr. Hemami concludes that requiring "the length of the code to represent how often a

8    value appears is not commensurate with any practical implementation."  *Id*.  Defendants' expert,

9    Dr. James A. Storer, stated that "it was well-known in the mid-1980s to create statistical codes

10   from the actual data being compressed."  Declaration of Dr. James A. Storer in Support of

11   Defendants and Declaratory Judgment Plaintiffs' Responsive Markman Brief ("Storer Decl."), ¶

12   69.  Dr. Storer's statement that it was well known at the time of invention how to compute

13   frequency with the actual data is consistent with Dr. Hemami's statement that it is possible to

14   compute frequency of occurrence from a model.  To the extent that Dr. Hemami reaches the

15   further conclusion that the analysis of actual data would not be practical, that opinion is

16   conclusive and without clear evidentiary support.  Accordingly, the Court relies on neither

17   expert's opinion in reaching its conclusion as to the proper construction of term two.

18      Defendants' argument that the specification requires coding of the actual data is not

19   persuasive.  While Table Three does describe how to create statistical codes from the amplitude

20   values, it is merely an *example* of a preferred embodiment.  '672 Patent, col.14, ll.3-6 ("The

21   TABLE 3 formulation is for one preferred embodiment of the ordered redundancy coding.  Many

22   variations, some hereinafter described, are possible.").[11]

23      Instead, the specification indicates that coding of "probable frequencies"—rather than

24   actual frequencies—may be used: "Typically, the statistical frequencies of the values to be coded

25   have an order.  Particularly, that order is based upon the *probable frequency of occurrence* of the

---

[11] When arguing that runlengths of zero length are not required, Defendants themselves
point out that Table Three is merely an example.  Responsive Br., p. 21; Tr. 178:16-24.

13

1  different values." '672 Patent, col.5, ll.22-25.  Defendants argue that "probable frequency"

2  applies to "the probability that any value in the digital signals to be coded will have a particular

3  numerical value."  Responsive Br., p. 36, n. 28.  However, this interpretation of "probable

4  frequency" is not required by the language cited by Defendants:

5       The signals to be coded are *typically* multiple values where the multivalued digital
        numbers, X(k), are typically the integers 0, 1, 2, 3, 4, . . . , and so on arranged in
6       any order.  Frequently, some values are repeated in forming digital numbers and
        hence the *probable frequency of occurrence* of some values is different than for
7       other values.

8  '672 Patent, col.3, ll.16-22 (emphasis added).  The specification merely explains that some

9  values are more likely to occur than others; it does not establish a clear requirement that the

10 probable frequencies are generated from the actual data that is coded.  Moreover, this portion of

11 the specification expressly describes a *typical* scenario.

12      Accordingly, the Court concludes that there is no clear evidence in the language of the

13 claim terms nor in the specification that statistical coding of the actual data is required.  The

14 Court will adopt neither of the parties' proposed constructions.  Instead, as it suggested it would

15 do during oral argument, the Court will use the plain language of the claim term as its

16 construction.

17

18      *c. Claim terms three and four*

19      **"forming first runlength code values representing the number of consecutive first
        values of said digital signals followed by** [term 3:] **said second value** *or* [term 4:] **one
20      of said other values"** (claim 1)

21      **"forming first runlength code values representing the number of consecutive first
        values of said digital signals followed by** [term 3:] **said second value in a digital
22      number** *or* [term 4:] **one of said other values in the digital number"** (claim 6)

23      [term 3:] **"a first code value is formed representing a set of said first values followed
        by said second value"** [term 4:] **"a second code value is formed representing a set of
24      said first values followed by one or more of said other values"** (claim 38)

25      The essence of the dispute with respect to the proposed constructions of terms three and

26 four is whether the terms require the inclusion of runlengths of zero length.  Plaintiff's proposed

27 constructions include this requirement:

28      Term 3: "Forming, from the digital signal to be runlength encoded, code values of

14

a first type that represent both the number of consecutive first values in a series (*including runlengths of zero length*) and the second value that follows, thereby eliminating the need to explicitly code the first values and the second value."

Term 4: "Forming, from the digital signal to be runlength encoded, code values of a second type that represent both the number of consecutive first values in a series (including runlengths of zero length) and the second value that follows, thereby eliminating the need to explicitly code the first values."[12]

Defendants' proposed constructions do not include a requirement that runlengths of zero length be used:

Term 3: "Forming code values of a first type that represent both the number of consecutive first values in a series and the second value that follows, where the second value is implied and not separately encoded."

Term 4: "Forming code values of a second type that represent both the number of consecutive first values in a series and the second value that follows, where the other value is separately encoded."

Plaintiff acknowledges that "[i]f given its ordinary meaning, this language would cover any coding technique that employs runlength encoding of values where there are two or more values, *including the prior art distinguished in the patent*." Plaintiff Compression Labs Inc.'s Reply Brief, p. 8. Accordingly, Plaintiff seeks to import limitations from the specification into the meaning of terms three and four, such that these terms include the additional requirement of runlengths of zero length.

Plaintiff contends that runlengths of zero length are a necessary element of the '672 patent. However, as Defendants have demonstrated, it is possible to embody the invention without the use of runlengths of zero length. As described in detail by Dr. Storer, where a second value is preceded by a value other than a first value, it is possible to use an indicator other than a runlength of zero length to signal the presence of a first value. Storer Decl., ¶¶ 46-54. Plaintiff argues that treatment of the first runlength code as a "flag," as is done in Dr. Storer's alternative embodiment, disregards the purpose of using runlength codes that imply the second value. This argument ignores the fact that in the alternative examples a "flag" other than a runlength of zero

---

[12] Plaintiff's proposed constructions for terms three and four originally included the word "uniquely." During oral argument, Plaintiff's counsel instructed the Court to remove the word "uniquely" from its proposed constructions. Tr. 175:23-25.

15

1  length is used *only* when a second value is not preceded by a first value, that is, when a second

2  value is preceded by a first value, a runlength code implying the second value is used.  While

3  examples of the alternatives suggested by Dr. Storer are not included in the specification, the

4  specification specifically indicates that other embodiments may be possible: "While the invention

5  has been particularly shown and described with reference to preferred embodiments thereof, it

6  will be understood by those skilled in the art that the foregoing and other changes in form and

7  details may be made therein without departing from the spirit and scope of the invention." '672

8  Patent, col.23, ll.39-44.

9       The exemplary embodiments described in the specification include runlengths of zero

10  length.  Plaintiff argues that Defendants' proposed construction would exclude these preferred

11  embodiments.  *See, e.g.*, *Anchor Wall Systems, Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d

12  1298, 1308 (Fed. Cir. 2003) ("[I]t is axiomatic that a claim construction that excludes a preferred

13  embodiment . . . 'is rarely, if ever correct and would require highly persuasive evidentiary

14  support.'").  However, as stated above, the Federal Circuit has "expressly rejected the contention

15  that if a patent describes only a single embodiment, the claims of the patent must be construed as

16  being limited to that embodiment." *Phillips*, 415 F.3d at 1323.  Defendants' proposed

17  construction does not read out any of the embodiments described in the specification.  Their

18  proposed construction does not *require* the use of runlengths of zero length, but it also does not

19  *preclude* their use.  Accordingly, Plaintiff's argument is not persuasive.

20       Plaintiff asserts that the requirement that runlengths of zero length be used is described in

21  the specification in order to distinguish the '672 patent from prior art.  The Federal Circuit has

22  held that "a claim term will not carry its ordinary meaning if the intrinsic evidence shows that the

23  patentee distinguished that term from prior art on the basis of a particular embodiment, expressly

24  disclaimed subject matter, or described a particular embodiment as important to the invention."

25  *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366-67 (Fed. Cir. 2002).  However, it is

26  not at all clear that the patentee intended to distinguish the '672 patent from prior art by requiring

27  the use of runlengths of zero length.  There is no language in the patent claims that references

28  runlengths of zero length.  The only indication in the patent that runlengths of zero lengths will

16

be used is found in Table Three of the specification, which is only "one preferred embodiment of the ordered redundancy coding." '672 Patent, col.14, ll.3-19. Where the specification does distinguish the patented invention from prior art (Scene Adaptive Coding), the use of runlengths to imply second values is described as being useful to identify "*isolated* ones":

> One observation that can be made in the motion compensated coefficient differences (non-zero after normalization and quantization) and, to a certain degree, the interframe coefficient differences (non-zero differences) is that most of these differences are sparsely distributed with an overwhelming majority of them having an absolute value of one. Also, within these differences of ones, a significant portion of them are *isolated (surrounded by zero-valued coefficients)* along the path of a scanning. It is wasteful to use one amplitude code word to code each of these *isolated ones* in addition to using one runlength code word to identify their address (Runlength alone should be enough).

'672 Patent, col.12, ll.16-28 (emphasis added). Thus, the specification emphasizes the use of runlengths with an implied second value as an improvement over prior art *only* with respect to second values that are *surrounded by* first values—i.e., runlengths of greater than zero length.

Plaintiff also argues that the following language, used twice in the specification to describe the operation of the "most preferable example," requires the use of runlengths of zero length:

> Whenever the first type, R, of runlength coding is employed, no coding of the second value (usually 1) is required because an amplitude of 1 is implied simply by the use of the first type, R, of runlength coding.

'672 Patent, col.3, ll.45-48; col.5, ll.45-49. However, the plain terms of this sentence do not require that the first type of runlength coding is used when second values are not preceded by first values. Instead, it only requires that the second value is implied *when* the first type of runlength coding is used. Additionally, language found elsewhere in the specification can be interpreted to indicate that a second value is implied *only* when a first value is used:

> In the present invention, the *presence of a first value* (or first set of values) is used to imply the existence of a second value (or a second set of values) thereby eliminating the need to code the second value (or second set of values).

'672 Patent, col.13, ll.18-22 (emphasis added).

Accordingly, for the foregoing reasons, the Court will adopt Defendants' proposed constructions for terms three and four, as they are stated above.

17

1    **d.  Claim term five**

2    **"number(s) [of consecutive first values]"** (claims 1, 4, 6, and 10)

3    The parties' dispute with respect to term five also concerns whether the '672 patent

4    necessarily includes runlengths of zero length.  However, there is essentially no substantive

5    difference between the constructions proposed by the parties.  Plaintiff proposes that term five be

6    construed as: "*The non-negative integers 0, 1, 2, 3, . . .*"  While Plaintiff may intend by this

7    definition to incorporate the requirement that there are runlengths of zero length, it is not clear

8    that this language would have that effect.  The claim construction offered by Plaintiff includes

9    the entire set of non-negative integers beginning with zero, which is an *infinite* set.  Accordingly,

10   unless Plaintiff intends to mean that the patent covers only those embodiments in which *every*

11   non-negative integer is included (which seems impossible), this proposed construction must

12   necessarily be interpreted as providing the set of *possible* integers.  Thus, the construction offered

13   by Plaintiff essentially is identical to the construction proposed by Defendants, that term five be

14   construed as: "*A count of consecutive first values—i.e., a run length*."  A "count" similarly would

15   include zero as a possible, but not required, number.  Because the Court is reluctant to imply that

16   a runlength of zero length is necessarily included, even though Plaintiff's definition probably

17   would not require it, the construction proposed by Defendants is preferable.  Accordingly, the

18   Court will construe "number(s) [of consecutive first values]" as "A count of consecutive first

19   values—i.e., a run length."

20

21   **e.  Claim term six**

22   **"amplitude encoding"** (claims 2 and 7)

23   During oral argument, the parties agreed to construe "amplitude encoding" as "Encoding

24   the exact amplitude of said following other values but not the first value or the second value."[13]

25   Tr. 204:14-206:5.  Accordingly, the Court adopts this construction.

26

27   _____

28   [13] This construction is identical to Plaintiff's proposed construction, with the exception that "specifying" is replaced with "encoding."

18

1          *f. Claim term seven*

2          **"sign value"** (claims 3 and 8)

3          A sign indicates whether a number is positive (+) or negative (-).  The value of the

4   number without the sign is a magnitude (i.e., an absolute value).  For example, the numbers -3

5   and 3 have the same magnitude, but with different signs.  Plaintiff argues that "sign value"

6   should be construed as "*A bit or code which indicates the sign.*"  Defendants suggest that it

7   should be construed as "*An indicator of the sign of a value—i.e., whether a value is positive or*

8   *negative—independent of the representation of the magnitude of the value.*"

9          The essence of the parties' disagreement is whether the sign value must be "independent

10  of the representation of the magnitude of the value."  Defendants argue that, for the purpose of

11  later establishing infringement, Plaintiff seeks to construe "sign value" in such a way as to

12  establish that a "one's complement" system of coding uses a sign value.  The following charts

13  show two possible systems for indicating positive and negative values:[14]

14       binary numbers with additional bit        "one's complement" coding
            - 3    011                             - 3    00
15           3    111                              3    11
            - 4    0101                            - 4    011
16           4    1101                             4    100

17  In the first coding system, the magnitudes of each value are represented by the same code, and

18  the first bit of each code represents the sign value.  In this case, "0" represents negative and "1"

19  represents positive.  In the "one's complement" coding system, the negative and positive values

20  of each magnitude are represented by inverting the code.  However, in this example, each

21  positive value begins with a "1" and each negative value begins with a "0."  Defendants suggest

22  that Plaintiff's proposed construction inappropriately would allow for an interpretation of "sign

23  value" that would include the first bit of the code in a "one's complement" coding system, even

24  though the first bit is "integrally part of the representation of the value itself."  Defendants and

25  Declaratory Judgment Plaintiffs' Responsive Markman Brief ("Responsive Br."), p. 42 n.37.

26

27  ─────────────────

28          [14] Defendants provided these examples in their brief, and they have not been challenged
    by Plaintiff.

                                          19

1    Defendants contend that "sign value" must be construed as "independent of the

2    representation of the magnitude of the value" because it must be distinct from "first values,

3    second values and other values" in independent claims 1 and 6.  Dependent claims 3 and 8 state:

4        The method of claim [1/6] further including the step of encoding said first and
         second runlength code values with a *sign value.*

5

6    '672 Patent, col.23, ll.63-65; col.24, ll.30-32 (emphasis added).  Dependent claims 3 and 8

7    represent distinct elements which, arguably, require that the sign value is encoded separately and

8    during a separate step than the magnitude of first and second runlength code values.  However,

9    this does not necessarily imply that the term "sign value" must *itself* encompass the requirement

10   that the sign value is construed independently from the magnitude.  As stated in the specification,

11   it is possible to encode the sign within a table:

12       The TABLES 6 and 7 were formed based upon the assumption that a separate sign
         bit, S or $\bar{S}$, not in the tables is to be used to indicate the sign of each value coded
13       in the manner indicated in TABLE 5.  *Alternatively, the sign information can be
         encoded into TABLE 6 or TABLE 7.*  For example, a table like TABLE 6 can be
14       used to represent runlengths of 0's that are followed both by positive and by
         negative non-zero numbers.  Such a table would be greater in length than TABLE
15       6 (expanded essentially to double the length) to provide entries for runlengths of
         0's followed by both negative and positive non-zero numbers.  Of course, such a
16       table would be ordered in accordance with the statistical frequency of both
         positive and negative numbers.

17

18   '672 Patent, col.18, ll.6-17 (emphasis added).  The possibility that a table may include positive

19   and negative values, not necessarily with the sign value separately encoded, does not lead to the

20   conclusion that claims 3 and 8 do not require separate encoding of a sign value.  However, this

21   possibility does caution against incorporating an unnecessary limitation into the construction of

22   the term "sign value."

23       The Court will not incorporate the requirement that a "sign value" is "independent of the

24   representation of the magnitude of the value" into the construction of this term.  However, the

25   first portion of Defendants' proposed construction is consistent with the use of "sign value" in

26   the patent.  Accordingly, the Court construes "sign value" as "An indicator of the sign of a value

27   — i.e., whether a value is positive or negative."

28

20

1

2

3

4

        ***g. Claim term eight***

        **"a table [is provided storing a plurality of runlength code values representing a plurality of different numbers of consecutive first values followed by said second value, and storing a plurality of second runlength code values representing a plurality of different numbers of consecutive first values followed by one of said other values]"**

5

6

7

8

9

        During oral argument, the parties agreed to the following construction of "table": "A collection of data, in which each item is uniquely identified by a label, by its position relative to the other items, or by some other means."  Tr. 234-36; Scarsi Decl., Ex. 5, p. 37 (*IEEE 917: IEEE Standard Dictionary of Electrical and Electronic Terms* (3d. ed. 1984)).  Accordingly, the Court adopts this definition for the construction of "table."

10

11

12

13

        ***h. Claim term nine***

        **"set [of said first values followed by said second value]"** & **"set [of said first values followed by one or more of said other values]"** (claim 38)

14

15

16

17

18

19

20

21

22

23

24

25

26

27

        The parties' dispute with respect to the construction of this term is the same as their dispute with respect to claim terms three, four, and five: whether runlengths of zero length are necessarily required by the claim terms.  Plaintiff proposes that this term should be construed as: "*A sequence of zero or more values*;" while Defendants propose that it should be construed as: "*A count of consecutive first values 'followed by said second value*;" "*A count of consecutive first values 'followed by one or more of said other values.*'" As with the proposed constructions of term five, the Court perceives little if any substantive difference between the proposed constructions for term nine.  While neither construction necessarily *requires* that runlengths of zero length be used, both allow runlengths of zero length as a possibility.  Additionally, the Court is not persuaded that this term would be clarified further by using either "sequence" or "count" instead of set.  No party has addressed whether there is any difference between the terms "sequence" and "count" or why it would be beneficial to use either of these terms rather than "set."  Accordingly, without any persuasive argument for giving term nine any construction other than its plain meaning, the Court will provide no additional construction for this term.

28

Case No. M: C 05-01654 JF (RS) and C 05-01567 JF (RS)
ORDER CONSTRUING CLAIMS OF UNITED STATES PATENT NO. 4,698,672
(JFLC1)

*i. Claim terms ten and eleven*

*Term 10*: **"decoding said first code value to form a set of said first values followed by said second value"** (claim 38)

*Term 11*: **"decoding said second code value to form a set of said first values followed by one or more of said other values"** (claim 38)

Defendants propose that terms ten and eleven be construed to mean "*converting a code value of a first type to a number of consecutive first values and the second value, where the second value is implied by the first code value and not separately encoded*" and "*converting a code value of a second type to a number of consecutive first values to be followed by at least one of the other values, where the other value is separately encoded,*" respectively. Plaintiff initially argued that terms ten and eleven require no construction apart from the construction of "set," which is construed separately as term nine. During oral argument, Plaintiff's counsel accepted Defendants' proposed constructions, with the qualification that "number" is defined to include zero.[15] Tr. 220:3-17, 230:3-8. The Court has already concluded that, while the set of numbers includes zero, the term "number" does not necessarily imply that there are runlengths of zero length. Accordingly, the Court does not adopt the condition requested by Plaintiff during oral argument. However, because the Court nevertheless concludes that there is no substantive dispute about the proper construction of terms ten and eleven, separate from the independent dispute regarding "number," the Court adopts Defendants' proposed constructions for these terms.

## 2.    Preamble claim limitations

Defendants argue that the Court should construe the preambles of claims 1, 6, 10 and 38 as reciting claim limitations. During the claim construction hearing, it became apparent that there was an inadvertent miscommunication between Plaintiff and Defendants as to whether the preamble of claim 38 recites claim limitations. Accordingly, the Court requested and received

---

[15] Plaintiff argued similarly in its papers that if the Court does construe terms 10 and 11, the terms should be construed such that it is clear that a set includes runlengths of zero length.

22

1    supplemental briefing addressing whether the preamble of claim 38 recites claim limitations and,

2    to the extent that the issue had not been addressed in previous briefings or at oral argument,

3    whether the preambles of claims 1, 6, and 10 similarly recite claim limitations.

4        It is "not unusual" to treat the preamble language of a claim as limiting. *Bicon, Inc. v.*

5    *Straumann Co.*, 441 F.3d 945, 952 (Fed. Cir. 2006). The decision as to whether to treat a

6    preamble as a claim limitation is based "on the facts of each case in light of the claim as a whole

7    and the invention described in the patent," *Storage Tech. Corp. v. Cisco Sys., Inc.*, 329 F.3d 823,

8    831 (Fed. Cir. 2003), and "there is no 'litmus test' for determining whether preamble language is

9    limiting," *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 952 (Fed. Cir. 2006) (citing *Catalina*

10   *Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002)).

11       Preamble language generally is limiting "if it recites essential structure or steps, or if it is

12   'necessary to give life, meaning, and vitality' to the claim." *Catalina Marketing Int'l, Inc.*, 289

13   F. 3d at 808. For example, "dependence on a particular disputed preamble phrase for antecedent

14   basis may limit claim scope because it indicates a reliance on both the preamble and claim body

15   to define the claimed invention." *Id.* Also, if "the preamble is essential to understand limitations

16   or terms in the claim body" or the preamble recites "additional structure or steps underscored as

17   important by the specification," the preamble may be construed to limit the claim. *Id.* In *On*

18   *Demand Machine Corp. v. Ingram Industries, Inc.*, 442 F.3d 1331, 1343 (Fed. Cir. 2006), the

19   Federal Circuit found that a preamble "necessarily limits the claims" because "it states the

20   framework of the invention."

21       Preamble language generally is not limiting "'where a patentee defines a structurally

22   complete invention in the claim body and uses the preamble only to state a purpose or intended

23   use for the invention.'" *Id.* (quoting *Rowe v. Dror*, 112 F. 3d 473, 478 (Fed. Cir.1997)). If the

24   preamble language "merely extoll[s] benefits or features of the claimed invention," it "does not

25   limit the claim scope without clear reliance on those benefits or features as patentably

26   significant." *Id.* at 809. Preambles that "describ[e] the use of an invention generally do not limit

27   the claims because the patentability of apparatus or composition claims depends on the claimed

28   structure, not on the use or purpose of that structure." *Id.*

23

### a. Claim 1

*[1]*[16] *A method for processing digital signals, [2] where the digital signals have first values, second values and other values, [3] to reduce the amount of data utilized to represent the digital signals and [4] to form statistically coded signals such that the more frequently occurring values of digital signals are represented by shorter code lengths and the less frequently occurring values of digital signals are represented by longer code lengths, comprising,*

> *forming first runlength code values representing the number of consecutive first values of said digital signals followed by said second value,*
> *forming second runlength code values representing the number of consecutive first values of said digital signals followed by one of said other values.*

Plaintiff concedes that phrase [2] is limiting, but argues that the other three phrases are not. Defendants contend that the entire preamble is limiting, and the Court agrees.

Phrase [1] provides the antecedent basis for phrase [2], which all parties agree is limiting. Plaintiff's reliance on cases in which courts have held that preambles are not limiting because they merely recite a purpose are not persuasive. For example, in *Embrex, Inc. v. Service Engineering Corp.,* 216 F. 3d 1343 (Fed. Cir. 2000), the court concluded that the preamble "simply describe[d] the purpose of the claimed method." *Id.* at 1348. However, the preamble in that case included *only* the following description of purpose: "A method for controlling an immunizable disease of viral, bacterial, or microbial origin in an avian species." *Id.* at 1346. In contrast, the preamble to claim 1 of the '672 patent includes specific limiting language, and phrase [1] provides the antecedent bases for this limiting language.

Phrase [3] is necessary to give meaning to the claim. As Plaintiff has explained, "[d]igital image compression is the science of *reducing* the amount of data used to convey the information that comprises an image." Plaintiff Compression Labs, Inc.'s Opening Markman Brief, p. 3 (emphasis added). The patent specification states that "[t]he present invention relates to methods and apparatus for processing signals to *remove* redundant information thereby making the signals more suitable for transfer through a limited-bandwidth medium." '672 Patent col.1 ll.15-18 (emphasis added). Accordingly, a necessary aspect of the claim is that it *reduces* the

---

[16] The Court adopts the system used by the parties in their supplemental briefs for identifying specific phrases within the claims.

24

1   amount of data used, and thus phrase [3] is limiting.

2       Similarly, because the method of representing more frequently occurring values with

3   shorter code lengths and less frequently occurring values with longer code lengths is a

4   fundamental characteristic of the '672 patent and an integrated part of the entire preamble, phrase

5   [4] is necessary to give meaning to the claim.  Plaintiff argues that *Catalina Marketing Int'l, Inc.*,

6   289 F. 3d at 810-11, stands for the proposition that if a phrase is used in the body of one claim

7   and in the preamble of another, it must not be limiting where it is used only in the preamble.

8   However, this is an improper reading of *Catalina*, which held only that particular preamble

9   language was not limiting because it "would effectively impose a method limitation on an

10  apparatus claim without justification."  *Id*. at 810.  Plaintiff also argues in its supplemental brief

11  that if the Court concludes that phrase [4] is limiting, it should construe "values" as referring to

12  the first and second runlength code values described in the body of the claim.  Plaintiff is

13  reasserting the position that it took initially with respect to term two.  However, as noted above,

14  during oral argument the parties accepted the Court's proposal that additional construction not be

15  given to the term "values."  The Court requested supplemental briefing to address whether the

16  preamble of this claim is limiting, not to address an issue of claim construction that previously

17  had been briefed and argued.  Accordingly, without further construing "values," the Court

18  concludes that phrase [4] is limiting.

19

20      ***b.  Claim 6***

21  *[1] A method for processing input signals [2] to reduce the amount of data utilized to represent the input signals, the steps comprising,*
        processing the input signals to form processed signals where the processed signals are digital numbers having first values, second values, and other values,
        coding each digital number to form statistically coded signals such that the more frequently occurring values in the digital numbers are represented by shorter code lengths and the less frequently occurring values of coded signals are represented by longer code lengths, said coding including,
            forming first runlength code values representing the number of consecutive first values followed by said second value in a digital number,
            forming second runlength code values representing the number of consecutive first values followed by one of said other values in the digital number.

25

1    For the reasons stated above with respect to phrases [1] and [3] of claim 1, which are

2    substantially similar to phrases [1] and [2] of claim 6, the Court concludes that the entire

3    preamble of claim 6 is limiting.

4

5        *c.  Claim 10*

6    *The method of claim 6 wherein a table is provided storing a plurality of runlength code
     values representing a plurality of different numbers of consecutive first values followed*

7    *by said second value, and storing a plurality of second runlength code values
     representing a plurality of different numbers of consecutive first values followed by one*

8    *of said other values, said first runlength code values and said second runlength code
     values statistically organized in said table such that the statistically more frequently*

9    *occurring runlength code values are represented by shorter code lengths and the less
     frequently occurring values are represented by longer code lengths, and wherein*

10           said step of forming first runlength code values is performed by table lookup from
                  said table,

11           said step of forming second runlength code values is performed by table lookup
                  from said table.

12

13    Plaintiff contends that Defendants improperly characterize the first section of this claim,

14    preceding and including the word "wherein," as a preamble.  Plaintiff concedes that the entirety

15    of this section is limiting, but conditions its concession on the construction of "numbers" always

16    to include zero.  However, the Court has not adopted such a construction of "numbers," and

17    Plaintiff does not state what effect the Court's decision *not* to adopt Plaintiff's construction

18    would have on its concession.  Accordingly, because Plaintiff has stated that this section is not a

19    preamble, the Court concludes that the entirety of claim 10 limits the claimed subject matter.

20

21        *d.  Claim 38*

22    *[1] A method for processing digital signals, [2] where the digital signals have first values,
     second values and other values, [3] where the processing reduces the amount of data*

23    *utilized to represent the digital signals and [4] where the processing forms statistically
     coded signals such that the more frequently occurring values of digital signals are*

24    *represented by shorter code lengths and the less frequently occurring values of digital
     signals are represented by longer code lengths, where*

25           *[5] a first code value is formed representing a set of said first values followed by
                  said second value,*

26           *[6] a second code value is formed representing a set of said first values followed
                  by one ore more of said other values*

27           *comprising,*
             decoding said first code value to form a set of said first values followed by said

28                  second value,

26

1    decoding said second code value to form a set of said first values followed by one
2    or more of said other values.

3         For the reasons stated above with respect to the preamble of claim 1, which is

4    substantially similar to the first four phrases of claim 38, the Court concludes that the first four

5    phrases of claim 38 are limiting.  Additionally, the parties dispute whether phrases [5] and [6]

6    limit claim 38 such that it requires both encoding and decoding.  The Court concludes these

7    phrases do limit claim 38 in such a manner.

8         Because phrases [5] and [6] are not merely descriptions of the purpose of the claim and

9    instead provide specific limitations and antecedents to further claim limitations, the Court

10   concludes that these phrases are limiting.  Plaintiff argues that it would be illogical to construe

11   claim 38 such that it would require encoding and decoding in the same device.  Defendants'

12   proposed construction, however, does not require such an (arguably illogical) interpretation.

13   Defendants argue merely that the claim requires that both steps be performed, not that the same

14   device perform them.  The plain language of the claim requires that the step of encoding is

15   performed, not simply that the values have the characteristic of having been encoded—phrase [5]

16   requires that "a first code value *is formed*" and phrase [6] requires that "a second code value *is*

17   *formed*."  Accordingly, the Court concludes that phrases [5] and [6] are limiting and, thus, that

18   claim 38 requires both encoding and decoding.

19

20                      **III.  ORDER**

21        For the reasons discussed herein, the Court construes the disputed claim terms as set forth

22   above.

23        IT IS SO ORDERED.

24

25   DATED:  June 28, 2006

26

27                                          _____

28                                  JEREMY FOGEL
                                    United States District Judge

This Order has been served upon the following persons:

John Allcock                        JAllcock@graycary.com, lwatts@graycary.com

Amr O. Aly                          amr.aly@wilmerhale.com,

Morton Amster                       mamster@arelaw.com,

Bryan K. Anderson                   bkanderson@sidley.com, grodriguez@sidley.com;
                                    sjprobst@sidley.com

William L. Anthony, Jr              wanthony@orrick.com, lbrim@orrick.com

James R. Batchelder                 jbatchelder@daycasebeer.com

Robert John Benson                  RJBenson@hhlaw.com

Kenneth Martin Bernstein            kbernstein@arelaw.com,

David A. Boag                       dboag@arelaw.com

David C. Bohrer                     dbohrer@morganlewis.com, giyer@morganlewis.com;
                                    elizabeth.kim@morganlewis.com

Monte M. Bond                       mbond@godwinpappas.com, tsankey@godwinpappas.com;
                                    knevill@godwinpappas.com; twight@godwinpappas.com;
                                    crourk@godwinpappas.com; mmclemore@godwinpappas.com

James Patrick Bradley               jbradley@sidley.com, sstennett@sidley.com

Henry C. Bunsow                     bunsowh@howrey.com, lim@howrey.com

Nicholas M. Cannella                ncannela@fchs.com

Joseph M. Casino                    jcasino@arelaw.com,

Richard A. Cederoth                 rcederoth@sidley.com, rcederot@sidley.com;
                                    bdipasqu@sidley.com

Christopher E. Chalsen              cchalsen@milbank.com, vguevara@milbank.com

Michelle Lynn Davidson              MDavidson@omm.com, swhite@omm.com

Lloyd R. Day, Jr                    daylr@daycasebeer.com

Denise M. De Mory                   demoryd@howrey.com, kasenenkop@howrey.com;
                                    crunkt@howrey.com

Martin H. Dodd                      martin@dfdlaw.com

Jamie L. Dupree                     jdupree@dfdlaw.com

Mark D. Flanagan                    mflanagan@wsgr.com

Lauren B. Fletcher                  lauren.fletcher@wilmerhale.com,

28

| | | |
|---|---|---|
| 1 | Michael A. Futterman | mfutterman@dfdlaw.com |
| 2 | Brandy Jennifer Glad | jglad@omm.com, lrich@omm.com |
| 3 | Perry M. Goldberg | pgoldberg@irell.com, |
| 4 | Edmund Lee Haag, III | lhaag@fulbright.com, lzoldan@fulbright.com |
| 5 | David W. Hansen | dhansen@skadden.com, dhill@skadden.com |
| 6 | Donald R. Harris | dharris@jenner.com, |
| 7 | Robert T. Haslam | Robert.Haslam@hellerehrman.com, |
| 8 | | christine.chen@hellerehrman.com; kurt.kjelland@hellerehrman.com; yvonne.somek@hellerehrman.com |
| 9 | Scott W. Hejny | shejny@sidley.com, kcollins@sidley.com |
| 10 | Donna Hill | dwhill@skadden.com, vwang@skadden.com |
| 11 | John M. Hintz | john.hitz@wilmerhale.com, |
| 12 | Adam Hoffman | ahoffman@irell.com, |
| 13 | Michael J. Holston | mholston@morganlewis.com, |
| 14 | Eric Nord Hoover | ehoover@morganfinnegan.com, |
| 15 | Keith R Hummel | khummel@cravath.com, |
| 16 | | managing_attorneys_office@cravath.com; abhoumik@cravath.com; lbuterman@cravath.com; |
| 17 | | ilampl@cravath.com |
| 18 | Sten Anker Jensen, Esq | sajensen@hhlaw.com |
| 19 | James A. Jorgensen | jjorgensen@wmalaw.com, sgraham@wmalaw.com |
| 20 | Paul Robert Juhasz | pjuhasz@wmalaw.com, mpaul@wmalaw.com |
| 21 | Abraham Kasdan | akasdan@arelaw.com |
| 22 | Eric Joseph Klein | eklein@godwingruber.com, sspradlin@godwingruber.com |
| 23 | Alyssa T. Koo | alyssa.koo@hellerehrman.com |
| 24 | John W. Kozak | jkozak@leydig.com |
| 25 | Vivian S. Kuo | kuov@howrey.com, chased@howrey.com |
| 26 | Todd E. Landis | tlandis@godwingruber.com, bnoriega@godwingruber.com |
| 27 | Kristoffer Leftwich | kleftwich@sidley.com, pjackman@sidley.com |
| 28 | Douglas I. Lewis | dilewis@sidley.com |

| 1  | Stuart Lubitz | slubitz@hhlaw.com, |
| 2  | Martin F. Majestic | MMajestic@hansonbridgett.com, IPFilings@hansonbridgett.com |
| 3  | Steven R. Manchester | srman@gatespeed.com |
| 4  | Richard S. Mandaro | rmandaro@arelaw.com, rmandaro@optonline.net; dgoldberg@arelaw.com; litdoc@arelaw.com |
| 5  6 | Daniel W. McDonald | dmcdonald@merchant-gould.com, vhanson@merchant-gould.com |
| 7  | Stephen E. Morrissey | smorrissey@susmangodfrey.com, hdanielson@susmangodfrey.com |
| 8  | Michael Martin Murray | MMurray@milbank.com, smarino@milbank.com |
| 9  | Tibor L. Nagy | tnagy@susmangodfrey.com, pwallace@susmangodfrey.com |
| 10 11 | Susan Garell O'Neill | soneill@hansonbridgett.com, lbucsit@hansonbridgett.com; cagnost@hansonbridgett.com; calendarclerk@hansonbridgett.com; bswenson@hansonbridgett.com |
| 12 | Steven P. Petersen | spetersen@leydig.com, |
| 13 14 | Amy E. Pizzutillo | apizzutillo@morganlewis.com, scorson@morganlewis.com; bmccoy@morganlewis.com; kpackel@morganlewis.com; mdunglinson@wmalaw.com |
| 15 | Andrew Paul Price | aprice@fulbright.com, tmoon@fulbright.com |
| 16 | David T. Pritikin | dpritikin@sidley.com |
| 17 | H. Kenneth Prol | kprol@velaw.com, areiley@velaw.com; smendoza@velaw.com |
| 18 | George A. Riley | griley@omm.com, mhendersen@omm.com |
| 19 | Edgar G. Sargent | esargent@susmangodfrey.com, |
| 20 | Mark Christopher Scarsi | mscarsi@omm.com, |
| 21 | John F. Schultz | john.schultz@morganlewis.com, jminio@morganlewis.com |
| 22 | Willem G. Schuurman | bschuurman@velaw.com |
| 23 | Barry Kenneth Shelton | shelton@fr.com, tipton@fr.com; pickett@fr.com; marlow@fr.com |
| 24 | Seungtaik Michael Song | msong@wsgr.com |
| 25 | Stephen D. Susman | ssusman@susmangodfrey.com, ddefranco@susmangodfrey.com |
| 26 | Thomas N Tarnay | ttarnay@sidley.com, jburris@sidley.com |
| 27 | Eric S. Tautfest | etautfest@godwingruber.com, etautfest@yahoo.com |
| 28 | Brooke Taylor | btaylor@susmangodfrey.com, shoutstra@susmangodfrey.com |

Case No. M: C 05-01654 JF (RS) and C 05-01567 JF (RS)
ORDER CONSTRUING CLAIMS OF UNITED STATES PATENT NO. 4,698,672
(JFLC1)

| | | |
|---|---|---|
| 1 | Max Lalon Tribble, Jr | mtribble@susmangodfrey.com, lmartin@susmangodfrey.com |
| 2 | Terrence Joseph Truax | ttruax@jenner.com |
| 3 | Kaiwen Tseng | ktseng@orrick.com, hlee@orrick.com |
| 4 | Bart Edward Volkmer, Esq | bvolkmer@wsgr.com |
| 5 | Bruce Hilton Watrous, Jr | bwatrous@graycary.com, |
| 6 | David B. Weaver | dweaver@velaw.com, zamason@velaw.com |
| 7, 8, 9 | Garner K. Weng | gweng@hansonbridgett.com, lbucsit@hansonbridgett.com; calendarclerk@hansonbridgett.com; mmajestic@hansonbridgett.com; soneill@hansonbridgett.com; cagnost@hansonbridgett.com |
| | Shelley K. Wessels | swessels@wesselslaw.biz |
| 10, 11 | Michael Patrick Wickey | mwickey@hewm.com, |
| 12 | Danny L. Williams | danny@wmalaw.com, mpaul@wmalaw.com; mdunglinson@wmalaw.com |
| 13 | Robert T. Wittmann | bwittmann@leydig.com |
| 14 | Rowena Y. Young | ryoung@orrick.com, aako-nai@orrick.com; mtrinh@orrick.com; jcalderon@orrick.com; cwilkes@orrick.com |

Case No. M: C 05-01654 JF (RS) and C 05-01567 JF (RS)
ORDER CONSTRUING CLAIMS OF UNITED STATES PATENT NO. 4,698,672
(JFLC1)

# EXHIBIT G

ANSI/IEEE Std 100-1984
Third Edition

# IEEE
# Standard Dictionary
# of
# Electrical and
# Electronics
# Terms

**Frank Jay**
**Editor in Chief**

**J. A. Goetz,**
**Chairman**
**Standards Coordinating Committee**
**on Definitions (SCC 10)**

### Membership

S. Aronow
D. C. Azbill
T. H. Barton
N. M. Blachman
L. R. Bloom
D. G. Bodnar
J. Brazee
R. L. Brereton
R. W. Brodersen
N. M. Burstein
E. F. Chelotti
F. A. Denbrock
A. J. Estin
P. Fasang
H. Fickenscher
E. S. Gillespie
D. W. Jackson
R. H. Krambeck
B. J. Leon*
F. J. Levitsky

C. H. Liu
E. E. Loebner
A. C. Lordi
A. Ludbrook
G. H. Mallinson
G. E. Martin
D. T. Michael
J. J. Mikos
A. J. Montalbano
E. I. Muehldorf
B. C. Nowlan
E. S. Patterson
J. G. Pearce
F. J. Saal
W. G. Schmidt
R. M. Showers
H. H. Smith
R. B. Squires
R. S. Turgel
C. E. White
W. T. Wintringham†

†Deceased
*Past-Chairman



**Published by**
**The Institute of Electrical and Electronics Engineers, Inc.**
**New York, NY**



**Distributed in cooperation with**
**Wiley-Interscience, a division of John Wiley & Sons, Inc.**

Library of Congress Catalog Number 84-081283

© Copyright 1984
**The Institute of Electrical and Electronics Engineers, Inc.**
*No part of this publication may be reproduced in any form,*
*in an electronic retrieval system or otherwise,*
*without the prior written permission of the publisher.*

August 10, 1984

SH09332

**vibratory plow**                    1001                    **virtual cathode**



**Fig 2.2**
**Full Lightning Impulse**

**vibratory plow (cable plowing).** A plow utilizing induced periodic motion(s) of the blade in conjunction with drawbar pull for its movement through the soil. *Note:* Orbital and oscillating plows are types of vibratory plows that are commercially available. 52

**vibropendulous error (accelerometer).** A cross coupling rectification error caused by angular motion of the pendulum in a pendulous accelerometer in response to a linear vibratory input. The error varies with frequency and is maximum when the vibratory acceleration is applied in a plane normal to a pivot axis and at 45 degrees to the input axis. 46

**video (1) (radar).** Refers to the signal after envelope or phase detection, which in early radar was the displayed signal. Contains the relevant radar information after removal of the carrier frequency. 13

**(2) (television).** A term pertaining to the bandwidth and spectrum position of the signal resulting from television scanning. *Note:* In present usage, video means a bandwidth of the order of several megahertz, and a spectrum position that goes with a direct-current carrier. *See:* **signal wave.** 328

**video filter (non-real time spectrum analyzer) (spectrum analyzer).** A post detection low-pass filter. 68, 390

**video-frequency amplifier.** A device capable of amplifying such signals as comprise periodic visual presentation. *See:* **television.** 11

**video integration. (radar).** A method of utilizing the redundancy of repetitive video signals to improve the output signal-to-noise ratio, by summing successive signals. 13

**video mapping (radar).** The electronic superposition of geographic or other data on a radar display. 13

**video stretching (radar).** The increasing of the duration of a video pulse. 13

**video-telephone call (telephone switching systems).** A call between stations equipped to provide video-telephone service. 55

**vidicon.** A camera tube in which a charge-density pattern is formed by photoconduction and stored on that surface of the photoconductor that is scanned by an electron beam, usually of low-velocity electrons. *See:* **television.** 178,190

**viewing area (oscilloscope).** The area of the phosphor screen of a cathode-ray tube that can be excited to emit light by the electron beam. *See:* **oscillograph; screen, viewing.** 184

**viewing time (storage tubes).** The time during which the storage tube is presenting a visible output corresponding to the stored information. *See:* **storage tube.** 174,190

**viewing time, maximum usable (storage tubes).** The length of time during which the visible output of a storage tube can be viewed, without rewriting, before a specified decay occurs. *Note:* The qualifying adjectives **maximum usable** are frequently omitted in general usage when it is clear that maximum usable viewing time is implied. *See:* **storage tube.** 174,190

**virtual cathode (potential-minimum surface) (electron tubes).** A region in the space charge where there is a



**Fig 2.3**
**Lightning Impulse Chopped on the Front**



**Fig 2.4**
**Lightning Impulse Chopped on the Tail**

# EXHIBIT H

ANSI/IEEE Std 100-1988
Fourth Edition

# IEEE
# Standard Dictionary
# of
# Electrical and
# Electronics
# Terms

**Frank Jay**
**Editor in Chief**

**J. A. Goetz**
**Chairman**
**Standards Coordinating Committee**
**on Definitions (SCC 10)**

## Membership

Ashcroft, D. L.
Azbill, D. C.
Ball, R. D.
Balaska, T. A.
Bauer, J. T., Jr.
Blasewitz, R. M.
Boberg, R. M.
Boulter, E. A.
Frewin, L. F.
Bucholz, W.
Buckley, F. J.
Cannon, J. B.
Cantrell, R. W.
Chartier, V. L.
Cherney, E. A.
Compton, O. R.
Costrell, L.
Davis, A. M.
Denbrock, F.
DiBlasio, R.
Donnan, R. A.
Duvall, L. M.
Elliott, C. J.
Erickson, C. J.
Flick, C.
Freeman, M.

Gelperin, D.
Guifridda, T. S.
Goldberg, A. A.
Graube, M.
Griffin, C. H.
Heirman, D. N.
Horch, J. W.
James, R. E.
Karady, G. G.
Key, T. S.
Kieburtz, R. B.
Kincaid, M. R.
Klein, R. J.
Klopfenstein, A.
Koepfinger, J. L.
Lensner, W.
Masiello, R. D.
Meitzler, A. H.
Michael, D. T.
Michaels, E. J.
Migliaro, H. W.
Mikulecky, H. W.
Moore, H. R.
Mukhedir, D.
Muller, C. R.
O'Donnell, R. M.
Petersons, O.

Radatz, J.
Reymers, H. E.
Roberts, D. E.
Rosenthal, S. W.
Rothenbukler, W. N.
Sabath, J.
Shea, R. F.
Showers, R. M.
Skomal, E. N.
Smith, T. R.
Smith, E. P.
Smolin, M.
Snyder, J. H.
Spurgin, A. J.
Stephenson, D.
Stepniak, F.
Stewart, R. G.
Swinth, K. L.
Tice, G. D.
Turgel, R. S.
Thomas, L. W., Sr.
Vance, E. E.
Wagner, C. L.
Walter, F. J.
Weinschel, B. O.
Zitovsky, S. A.



**Published by**
**The Institute of Electrical and Electronics Engineers, Inc**
**New York, NY**

Case 1:06-cv-00251-GMS    Document 125-4    Filed 10/30/2007    Page 3 of 4

Library of Congress Catalog Number 88-082198

ISBN: 1-55937-000-9

© Copyright 1988

**The Institute of Electrical and Electronics Engineers, Inc**

*No part of this publication may be reproduced in any form,*
*in an electronic retrieval system or otherwise,*
*without the prior written permission of the publisher.*

From their c
(AIEE) (1884)
defining techni
in 1963 to bec

In 1928 the
Terms under th
National Stanc
*Standard Defi*
a second editi
it impracticab
limited to a sp

Over the ye
definitions or
then-approved

The 1972, 1
*and Electronic*
previously by
International I

Most of the
been reaffirm
responsible fo
present time.

The current

November 3, 1988

SH12070

**vestigial sideband (data transmission).** The transmitted portion of the sideband that has been largely suppressed by a transducer having a gradual cutoff in the neighborhood of the carrier frequency, the other sideband being transmitted without much suppression. 59

**vestigial-sideband modulation.** A modulation process involving a prescribed partial suppression of one of the two sidebands. 242

**vestigial-sideband transmission (facsimile).** That method of signal transmission in which one normal sideband and the corresponding vestigial sideband are utilized. *See:* **amplitude modulation; facsimile transmission.** 12

**vestigial-sideband transmitter.** A transmitter in which one sideband and a portion of the other are intentionally transmitted. *See:* **radio transmitter.** 111

**VF.** *See:* **voice frequency.**

**VHF.** *See:* **radio spectrum.**

**VHF radar.** *See:* **very-high-frequency radar.**

**vial (liquid-scintillation counters)(liquid-scintillation counting).** A glass or plastic sample container that meets the dimensional specifications of International Electrotechnical Commission (IEC) Pub 582-1977. 498, 422

**via net loss (vnl) (data transmission).** The net losses of trunks in the long distance switched telephone network of North America. The trunk is said to be in a via condition when it is an intermediate trunk in a longer switched connection. 59

**vibrating beam accelerometer (VBA) (inertial sensor).** A linear accelerometer whose proof mass is mechanically constrained by a force-sensitive beam resonator. The resultant oscillation frequency is a function of input acceleration. 46

**vibrating bell.** A bell having a mechanism designed to strike repeatedly when and as long as actuated. *See:* **protective signaling.** 328

**vibrating circuit (telegraph circuit).** An auxiliary local timing circuit associated with the main line receiving relay for the purpose of assisting the operation of the relay when the definition of the incoming signals is indistinct. *See:* **telegraphy.** 328

**vibrating-contact machine regulator (power switchgear).** A regulator that varies the excitation of an electric machine by changing the average time of engagement of vibrating contacts in the field circuit. 103

**vibrating-reed relay.** A relay in which the application of an alternating or a self-interrupted voltage to the driving coil produces an alternating or pulsating magnetic field that causes a reed to vibrate and operate contacts. *See:* **relay.** 259

**vibrating string accelerometer.** A device that employs one or more vibrating strings whose natural frequencies are affected as a result of acceleration acting on one or more proof masses. 46

**vibration.** An oscillation wherein the quantity is a parameter that defines the motion of a mechanical system. *See:* **oscillation.** 176

**vibration detection system (protective signaling).** A system for the protection of vaults by the use of one or more detector buttons firmly fastened to the inner surface in order to pick up and convert vibration, caused by burglarious attack on the structure, to electric impulses in a protection circuit. *See:* **protective signaling.** 328

**vibration meter.** An apparatus including a vibration pickup, calibrated amplifier, and output meter for the measurement of displacement, velocity, and acceleration of vibrations. *See:* **instrument.** 328

**vibration relay (power switchgear).** A relay that responds to the magnitude and frequency of a mechanical vibration. 103

**vibration test (rotating machinery).** a test taken on a machine to measure the vibration of any part of the machine under specified conditions. 63

**vibrato.** A family of tonal effects in music that depend upon periodic variations in one or more characteristics of the sound wave. *Note:* When the particular characteristics are known, the term vibrato should be modified accordingly, for example, **frequency vibrato; amplitude vibrato; phase vibrato** and so forth. 176

**vibrator (cable plowing).** That device which induces the vibration in a vibratory plow. *See:* **vibratory plow.** 52

**vibratory isolation (cable plowing).** Percentage reduction in force transmitted from vibration source to receiver by use of flexible mounting(s) (amount of isolation for a given unit varies with plow blade frequency). 52

**vibratory plow (cable plowing).** A plow utilizing induced periodic motion(s) of the blade in conjunction with drawbar pull for its movement through the soil. *Note:* Orbital and oscillating plows are types of vibratory plows that are commercially available. 52

**vibropendulous error (accelerometer).** A cross coupling rectification error caused by angular motion of the pendulum in a pendulous accelerometer in response to a linear vibratory input. The error varies with frequency and is maximum when the vibratory acceleration is applied in a plane normal to a pivot axis and at 45 degrees to the input axis. 46

**video (1) (radar).** Refers to the signal after envelope or phase detection, which in early radar was the displayed signal. Contains the relevant radar information after removal of the carrier frequency. 13
**(2) (television).** A term pertaining to the bandwidth and spectrum position of the signal resulting from television scanning. *Note:* In present usage, video means a bandwidth of the order of several megahertz, and a spectrum position that goes with a direct-current carrier. *See:* **signal wave.** 328

**video filter (non-real time spectrum analyzer) (spectrum analyzer).** A post detection low-pass filter. 390

**video-frequency amplifier.** A device capable of amplifying such signals as comprise periodic visual presentation. *See:* **television.** 11

**video integration (radar).** A method of utilizing the redundancy of repetitive video signals to improve the output signal-to-noise ratio, by summing successive signals. 13

**video mapping (rad** geographic or oth
**video stretching (r** of a video pulse.
**video-telephone ca** call between stati phone service.
**vidicon.** A camera tern is formed by surface of the ph electron beam, us **television.**
**viewing area (oscil** screen of a catho emit light by the **screen, viewing.**
**viewing time (stor** the storage tube sponding to the st

**viewing time, ma** length of time d storage tube can a specified decay tives **maximum u** eral usage when i ing time implied.
**virtual cathode (p** tubes). A region potential minimu density, behaves **tronic tube.**
**virtual duration (** rent or voltage i during which the 90 percent of its
**virtual duration o** rent (high voltag peak of a rectang ing which the cur peak value.
**virtual duration o** oxide surge arres rester). The virtu front is as follow front duration le on the front, cres voltage to increa
**(2) For voltage v** μs or more, the from actual zero current waves, 1 increase from 10

**virtual front time** impulse.
**virtual front time** front time $T_1$ of times the interva pulse is 10 and 9 tions are present